IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**BRENDA IRIZARRY-PAGAN** *et al.*,
    Plaintiffs,

    v.

**METRO SANTURCE, INC.** *et al.*,
    Defendants.

Civil No. 18-1532 (JAG/BJM)

## REPORT AND RECOMMENDATION

Plaintiffs Brenda Irizarry Pagan *et al.* (collectively "Plaintiffs") filed a wrongful death action against Metro Santurce, Inc. *et al.* (collectively "Defendants") after their relative Mercedes Ferrer Pérez ("the patient") died in front of them at Hospital Pavia Santurce. Defendants have filed a joint motion *in limine* to exclude the opinions and testimony of Plaintiffs' expert witness Dr. Ian Cummings ("Dr. Cummings"), a medical expert with experience in both teaching and practicing medicine, pursuant to Fed. R. Civ. P. 26, Fed. R. Evid. 702 and 703, and *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). Dkt. 91. Plaintiffs have opposed, Dkt. 103, Defendants have replied, Dkt. 128, and Plaintiffs filed a supplemental motion to their previous motion. Dkt. 132. This court has already denied Defendants' motion to exclude Dr. Cummings's testimony pursuant to Fed. R. Civ. P. 26, Dkt. 140; however, the court has yet to rule on whether Dr. Cummings's testimony should be excluded pursuant to *Daubert*. *Id*. The motion has been referred to me for a report and recommendation. *Id*. The parties have agreed that a *Daubert* hearing need not be held and that the motion can be resolved based on the submissions already filed with the court. Dkts. 143, 144. For the following reasons, I recommend that the motion to exclude the opinions and testimony of Dr. Cummings be **GRANTED IN PART**.

## BACKGROUND

The following factual allegations are drawn from the complaint in this matter, Dkt. 1, and are undisputed for the purpose of determining the outcome of this motion; I make no factual findings here and merely present the following for context.

Plaintiffs Brenda M. Irizarry Pagán, Dr. Emily E. Irizarry Pagán, Federico Pérez Irizarry, and Cristian Pérez Irizarry are adult grandchildren of the patient. Plaintiff Juan Carlos Izquierdo Amieiro is a grandchild-in-law of the patient. Defendants are Metro Santurce, Inc., a corporation that owns Hospital Pavia Santurce ("Hospital Pavia"); Dr. Sylmarie Marrero Martínez ("Dr. Marrero"), a specialist in internal medicine; Dr. Héctor Maldonado ("Dr. Maldonado"), a specialist in family medicine; Dr. Luis Cabrera De la Mata ("Dr. Cabrera"), a specialist in family medicine; Dr. José Rodríguez Escudero ("Dr. Rodríguez"), a specialist in internal medicine with a sub-specialization in cardiovascular disease; Dr. Reynerio Pérez Ramírez ("Dr. Perez"), a specialist in internal medicine with a sub-specialization in cardiovascular disease; Dr. Guillermo Vázquez Andino ("Dr. Vazquez"), a specialist in internal medicine with a sub-specialization in infectious disease; Dr. Carlos García Rodríguez ("Dr. Garcia"), a specialist in internal medicine with a sub-specialization in pulmonology; and various unnamed doctors and insurance companies.

Plaintiffs allege as follows: on July 22, 2016, the patient checked her oxygen saturation at home. Her oximeter showed that she had a blood oxygen saturation level of 84%. She informed her cardiologist, who referred her to Hospital Pavia Santurce's emergency room ("ER") to be evaluated by the on-duty cardiologist. According to the ER's triage nursing notes, two EKGs (or electrocardiograms) were performed on the patient. The EKGs suggested that Mrs. Ferrer Pérez was possibly suffering from an anterior myocardial infarction. As a result, the attending ER physician ordered blood laboratories, cardiac marker tests, and several diagnostic studies. One of

the tests, an "NT Pro BNP," was not performed in timely fashion; when it was eventually performed, this test supposedly suggested that the patient was suffering from an acute myocardial infarction or renal insufficiency. Other tests ordered by the physician were not performed at all. The attending physician reached initial diagnoses of hypercapnia and hypoxia and consulted codefendants Dr. Marrero and Dr. Maldonado. Dr. Marrero admitted the patient to the hospital with diagnoses of hypercapnia, respiratory failure, pneumonia, hypoxemia, atrial fibrillation with anticoagulants, cellulitis in the left leg, bronchial asthma, and CHF (or congestive heart failure). However, although CHF was one of Dr. Marrero's diagnoses, she did not consult the cardiology department or follow up on the tests that were previously ordered but never performed on the patient. Although Dr. Marrero was the admitting physician, the patient was admitted to the hospital "under the services" of Dr. Cabrera.

Dr. Maldonado evaluated the patient on the morning of July 23, 2022. Although Dr. Maldonado seemingly reached the same diagnoses as Dr. Marrero, he did not consult with the cardiology department for some time or follow up on the missing tests despite being informed of the test results suggesting that the patient was suffering from an acute myocardial infarction or renal insufficiency. On July 26, 2022, the patient was sent by Dr. Maldonado for a consultation with the cardiology department. Dr. Rodriguez took charge of the consultation. That day, an echocardiogram revealed that the patient had "preserved ejection fraction, mild multi-valvular pathology, a small pericardial effusion and dilated left atrium," while an EKG allegedly showed results consistent with myocardial infarction; however, no sequential tests to measure the patient's troponin levels were ordered (which supposedly would have helped assess whether the patient was suffering from acute myocardial infarction). During this time, the patient's CHF diagnosis was allegedly downplayed while the individuals treating the patient focused on addressing chronic

respiratory failure instead; the individuals also failed to rule out myocardial infarction as a principal diagnosis. The patient's blood urena nitrogen ("BUN") to creatinine levels continued to rise while her carbon dioxide levels stayed high, allegedly suggestive of myocardial infarction and gastrointestinal bleeding. On August 1, 2016, she had an x-ray that suggested she had a pulmonary edema associated with a plural effusion.

On August 2, 2016, the patient's relatives (including her doctor granddaughter) noticed that the patient was exhibiting symptoms consistent with having had a stroke. A nurse told the family that the patient "had nothing," while Dr. Cabrera did not act because he did not believe that the patient had had a stroke. He also told the family that he would order the patient's discharge home with oxygen treatment. The patient was supposed to be discharged on August 4, 2016, apparently while already in the process of experiencing acute renal failure, respiratory failure, and acute heart failure. On the morning of August 4, a nurse noticed that the patient was not connected to telemetry equipment even though she had been ordered to be. An EKG taken that morning yet again supposedly showed symptoms consistent with a myocardial infarction. After the EKG was taken, the patient began to bleed from the anus, suffered a vasovagal event, and fainted in the bathroom. As a result, the patient was not discharged but was kept under observation and telemetry. The family asked if the patient's blood coagulation levels had been measured, but a nurse told them that she did not have anything to say to them in that regard. The patient was allegedly in critical condition but Dr. Cabrera did not go to see her despite being notified of changes in her condition for the worse.

On the afternoon of August 4, Dr. Vazquez noted in an evaluation that the patient's vital signs were adequate and that her white blood cell count had increased. However, the patient's family claim to have not seen him that day despite being in the room at the time he allegedly

evaluated the patient; Plaintiffs also claim that the patient's blood pressure signs were not adequate despite the evaluation. A pulmonologist told the family that he would put the patient on respiratory support, but the patient turned purple and died soon afterwards. Dr. Cabrera noted on the patient's death certificate that the initiating cause of the events leading to the patient's death was a cardiac infarction, that she subsequently experienced hypercapnia and cardiac failure, and that her actual cause of death was atrial fibrillation.

Plaintiffs claim that the patient underwent needless pain and suffering and that she died sooner than she otherwise would have as a result of her treatment. They argue that the treatment the patient received was substandard and inappropriate at many junctures. Plaintiffs claim that they themselves suffered emotional harm as a result of this substandard treatment. They accuse the defendants of negligence amounting to medical malpractice and request a declaration that the defendants committed medical malpractice as well as an award of $75,000.00 each plus costs for non-economic damages.

Plaintiffs are attempting to use Dr. Cummings as an expert witness in support of their claims. Dr. Cummings has produced a report, Dkt. 93-1, in which he states that many deviations from medical standards of care occurred in the present matter. Dr. Cummings claims that Dr. Marrero deviated from standards of care by failing to admit the patient to telemetry or the ICU; failing to consider CHF as the cause of the patient's hypercarbia and respiratory distress while diagnosing chronic respiratory failure instead; failing to pursue a diagnosis of myocardial infarction despite symptoms suggesting its presence; failure to immediately consult cardiology and follow up on tests; and failure to react to certain test results and diagnose CHF sooner. He claims that Dr. Maldonado deviated from standards of care for the same reasons. Dr. Cummings states that Dr. Cabrera deviated from standards of care for all of the same reasons as well, but adds that

*Irizarry-Pagan et al. v. Metro Santurce, Inc. et al.*, Civil No. 18-1532 (JAG/BJM)                    6

Dr. Cabrera failed to respond immediately to the family's claims that the patient might be undergoing a neurological emergency; failed to document his visit the day after the family noticed this possible neurological event; failed to order a brain CT scan, seek neurologic consultation, or consider potential life-threatening causes of the patient's rectal bleeding; failed to administer proton pump inhibitors and pump drip, cease administration of Xarelto, or reverse Xarelto anticoagulation upon becoming aware of gastrointestinal bleeding; failed to consult gastroenterology for emergent esophagogastro-duodenoscopy, recognize the implications of dramatically elevated blood urea nitrogen levels, or recognize that the patient's lack of consciousness was likely hypovolemia, all suggestive of, symptomatic of, or related to treating upper gastrointestinal bleeding; and failed to immediately respond to, evaluate, and treat the patient during her final moments.

Dr. Cummings goes on to accuse Dr. Vazquez of deviating from standards of care by failing to answer a consultation to infectious diseases within twenty-four hours and fraudulently documenting a patient visit that did not actually occur. Dr. Cummings says that Dr. Rodriguez deviated from standards of care by failing to consider CHF as the cause of the patient's hypercarbia and respiratory distress while diagnosing chronic respiratory failure instead; failing to follow up on test results; failing to react to certain test results and diagnose CHF sooner; and failing to consider percutaneous coronary intervention in an effort to save the patient's life. He accuses Dr. Perez of deviating from standards of care for the same reasons while accusing Dr. Garcia solely of failure to consider CHF as the cause of the patient's hypercarbia and respiratory distress while diagnosing chronic respiratory failure instead. Dr. Cummings accuses Hospital Pavia of violating standards of care by failing to pursue a diagnosis of myocardial infarction immediately; failing to enact multiple physician's orders; failing to report certain test results to the patient's attending

physician in a timely manner; improperly withholding information from the patient's family related to her care; and failing to initiate a "code blue" emergency response when the patient became unresponsive (as she allegedly did not have a valid "do not resuscitate" order in place). Depositions of Dr. Cummings have already taken place, and Defendants are now attempting to preclude his testimony.

## APPLICABLE LEGAL STANDARDS

This is a diversity action; thus, the substantive law of the forum state controls. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). For this purpose, Puerto Rico is treated as the functional equivalent of a state. *See, e.g.*, *Rolón–Alvarado v. Mun'y of San Juan,* 1 F.3d 74, 77 (1st Cir. 1993). Plaintiffs who seek to prove medical malpractice under Puerto Rico law must establish three elements. First, they must establish the "duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances)." *Cortés–Irizarry v. Corporación Insular De Seguros*, 111 F.3d 184, 189 (1st Cir. 1997). Relevantly, "Puerto Rico holds health care professionals to a national standard of care." *Id.* at 190. Second, they must establish "an act or omission transgressing that duty." *Id.* at 189. With respect to this requirement, "Puerto Rico law presumes that physicians exercise reasonable care." *Id.* at 190. Third, they must establish "a sufficient causal nexus between the breach and the claimed harm." *Id.* at 189. A plaintiff "ordinarily must adduce expert testimony to limn the minimum acceptable standard and confirm the defendant doctor's failure to meet it." *Id.* at 190.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony

is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The trial court acts as a gatekeeper, and the judge must ensure an expert's testimony is both relevant and reliable. *See Daubert*, 509 U.S. at 597; *United States v. Mooney*, 315 F.3d 54, 62 (1st Cir. 2002).

## DISCUSSION

I note (as I did above) that this court has already denied the portion of the present motion calling for the preclusion of Dr. Cummings's testimony pursuant to Fed. R. Civ. P. 26. I also note that in doing so, this court stated that "the supplemental or corrective information was disclosed during the two expert depositions held in 2019 and 2021 and, thus, no obligation to supplement existed" and that "there is no surprise since the new information was disclosed to Defendants in the expert's supplemental report, rebuttal reports, and depositions." Dkt. 140. As a result, my review of Defendants' motion is strictly limited to issues arising under *Daubert* and ancillary issues arising under Fed. R. Evid. 702 and 703. *Id*.

Defendants make two *Daubert* arguments: first, that Dr. Cummings's report does not identify the standards of care applicable to each of the defendants and the scope of these standards or fails to identify the source of or basis for any standards of care he does identify; and second, that his report fails to establish how each defendant caused or contributed to the harms claimed by Plaintiffs in this matter. I shall deal with these arguments in turn.

Defendants take the position that Dr. Cummings's report makes deficient references to unspecified standards of care. While Dr. Cummings clearly identifies what he considers to be standards of care in his report, Defendants claim that Dr. Cummings did not "correlate" the standards of care he identifies with a certification process, medical literature, or any other reliable source, stating that this makes his claims wholly conclusory. Defendants also claim that Dr.

Cummings did not establish that the standards he applied to physicians are national in scope or that the standards he applied to the hospital and its staff apply specifically to this locality.

In support of these arguments, Defendants correctly note that merely demonstrating that an expert has experience does not render every opinion and statement by that expert reliable. Defendants also state that establishing that a given standard of care is applicable nationally is done by referencing a published standard, discussion of the described course of treatment with practitioners at seminars or conventions, or through presentation of relevant data. These are indeed ways in which an expert could establish a national standard of care, but as Plaintiffs note, this list is not exhaustive; an expert does not describe a national standard of care by merely stating what he would have done differently, but he does not necessarily need to adhere strictly to the three categories cited by Defendants in establishing a national standard either. *See Vargas-Alicea v. Cont'l Cas. Co.*, 15-CV-1941 (PAD), 2020 WL 3470325, at *3 (D.P.R. June 25, 2020). An expert also need not mention or produce medical literature when identifying a standard of care in her report, as Federal Rules of Evidence 703 and 705 place the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination. *See Toucet v. Mar. Overseas Corp.*, 991 F.2d 5, 10 (1st Cir. 1993) (citing *Smith v. Ford Motor Co.*, 626 F.2d 784, 793 (10th Cir.1980)); *Vargas-Alicea*, 2020 WL 3470325 at *5. As a result, Dr. Cummings need not necessarily cite literature or a published standard in demonstrating that he has relevant expertise here; instead, his personal experience alone may be sufficient. *See, e.g.*, *Delgado v. Dorado Health Inc.*, 14-CV-1735 (PAD), 2016 WL 4742257, at *4 (D.P.R. Sept. 2, 2016) (report and recommendation subsequently adopted in 2016 WL 4742259) (noting that experience alone can be sufficient to establish that an expert is qualified to offer opinions regarding standards of care under Fed. R. Evid. 702). The sufficiency of Dr.

Cummings's personal experience has not actually been challenged here, and regardless, Dr. Cummings appears to have sufficiently established that he has relevant expertise through deposition testimony and other means. *See generally, e.g.*, Dkt. 55-4 (deposition testimony outlining Dr. Cummings's extensive expertise in relevant areas in some detail).

Again, Defendants also claim that Dr. Cummings did not establish that the standards he applied to physicians are national in scope or that they apply locally. In addressing whether Dr. Cummings's report failed to identify local or national standards of care, I shall turn to an issue that Defendants allude to only in passing. Defendants provide a cursory citation to a case in which Dr. Cummings's testimony was precluded by this court, *Santa Cruz-Bacardi v. Metro Pavia Hosp., Inc.*, 16-CV-2455 (RAM), 2019 WL 3403367 (D.P.R. July 26, 2019). Defendants do not craft any particular argument in citing the case, only noting that this court has previously precluded Dr. Cummings's testimony. Nonetheless, *Santa Cruz-Bacardi* encompasses other issues raised by Defendants and goes directly to the issue of whether Dr. Cummings's testimony in the present matter is deficient or conclusory when it comes to establishing standards of care. In *Santa Cruz-Bacardi*, this court noted that "Dr. Cummings' report clearly fails to establish how he reached the conclusions he did regarding standards of care." *Id*. at *5 (emphasis removed). The case arguably implies that it is necessary to cite some form of medical literature or other reputable source in establishing a national standard of care. *Id*. at *6. Additionally, while this court acknowledged in *Santa Cruz-Bacardi* that "a doctor testifying as an expert witness may sometimes imply a standard of care in their testimony without articulating the 'magic words,'" or in other words directly referencing a standard of care, the court found that Dr. Cummings had not done so because the closest he came to referencing a standard of care was discussing what "most pulmonologists" or "good pulmonologists" do. *Id*. at *5. The court reached this conclusion despite Dr. Cummings

including a section in his report titled "Summaries of Failures to Meet the Standards of Care by Defendants" that laid out purported violations of standards of care; this is almost identical to the layout of Dr. Cummings's report in the present matter. *See id.*, Dkt. 64-4 at 9. If there is no substantive distinction between *Santa Cruz-Bacardi* and the present matter, then an argument could be made that as a result, Dr. Cummings's testimony should be precluded here.

This argument appears reasonable on its face, as at first glance there is no immediately obvious substantive distinction between the report in *Santa Cruz-Bacardi* and Dr. Cummings's report in the present matter. Unfortunately for Defendants, however, the First Circuit recently made it clear in *Martinez v. United States*, 33 F.4th 20 (1st Cir. 2022), that the *Daubert* standard in this circuit is significantly more relaxed than Defendants (and arguably *Santa Cruz-Bacardi*) suggest. There is no clear indication that the medical expert in *Martinez* referenced any particular outside source, materials, or other basis for an opinion in crafting his report within the report itself, nor does it seem that any such indications arose during his deposition testimony. *See Martinez et al. v. United States*, 16-CV-2430 (RAM), 2019 WL 3022497 at Dkt. 33-2 (D.P.R. July 10, 2019). Instead, the expert made vague references to "accepted clinical practice" and "departures" from "accepted medical practice" without articulating how he gained awareness as to what the bounds of the relevant accepted clinical and medical practices actually were or explicitly stating that these principles were national in scope. *Id*. Nevertheless, the First Circuit overturned this court's determination that the expert's testimony should be excluded and found these and similar references acceptable when it came to establishing national standards of care. Furthermore, in regards to one of the standards of care the First Circuit also found that it was enough that the expert made one of these seemingly vague references within deposition testimony rather than within the report itself. *Martinez*, 33 F.4th at 28-29.

While I otherwise might have been inclined to read *Santa Cruz-Bacardi* as supporting the notion that Dr. Cummings's testimony failed to adequately establish standards of care, it is now clear that under *Martinez*, the *Daubert* standard in the First Circuit when it comes to establishing standards of care is exceedingly broad and much looser than a cursory reading of *Santa Cruz-Bacardi* would suggest. *Martinez* establishes that general references to the "prevailing medical standard" or "accepted clinical practice" can be enough to establish standards of care in context, even without clear bases established for these standards from medical literature or any other source material, while a relevant standard of care need not be elucidated in an expert report itself but can be laid out within a deposition or elsewhere instead. *Martinez*, 33 F.4th at 28-29. *See also Cortes-Irizarry*, 111 F.3d at 190. Given these unexacting parameters for establishing standards of care, I am not convinced that this court would reach the same result in *Santa Cruz-Bacardi* today, and as a result I believe that *Santa Cruz-Bacardi* does not have controlling effect here.

I recommend finding that Dr. Cummings has met the burden for identifying violations of standards of care as it is elucidated in *Martinez*. In the medical report cited by Defendants, Dr. Cummings includes a lengthy list with the heading "Deviations from standards of care" and lays out a long list of specific deviations from standards of care purportedly taken by the various defendants in this matter. Dkt. 91-1 at 9-14. He also mentions that he has attempted to determine if the medical and nursing staff at the hospital "engaged in departures from the standard of medical care in the hospital setting." *Id*. at 1. Under *Martinez*, at this stage of the proceedings these admittedly cursory references to standards of care are enough to establish that the deviations that follow are violations of national standards of care. The court in *Martinez* made it clear that an expert's report that lacked any explicit references to "national" standards still established national standards of care, finding as noted above that even a general statement about "accepted clinical

practice" made in a deposition was enough to establish such a standard. In reaching this finding, the court noted that "affiants and witnesses need not be precise to the point of pedantry" with regards to establishing a national standard of care. *Martinez*, 33 F.4th at 29 (citing *Cortes-Irizarry*, 111 F.3d at 90).

Under *Martinez*, there is every reason to believe that requirements are highly similar when it comes to establishing local (as opposed to national) standards of care. Moreover, it is not clear that local standards of care are entirely distinct from national ones in this context. *See Cortes-Irizarry*, 111 F.3d at 190 ("Puerto Rico holds health care professionals to a national standard of care"). Though Defendants cite *Pages-Ramirez v. Hosp. Espanol Auxillo Mutuo De Puerto Rico, Inc.*, 547 F. Supp. 2d 141, 149 (D.P.R. 2008), for the notion that nurses are held to a local standard of care, it is unclear why nurses are not subject to the national standard owed by medical professionals towards patients in addition to any local standard specifically for nurses. *See id*. at 148-49 ("Puerto Rico courts have explained the duty owed to a patient as that level of care which, recognizing the modern means of communication and education, meets the professional requirements generally acknowledged by the medical profession. . . . The standard is considered national and should generally be proven through expert testimony").

Furthermore, the source of or bases for Dr. Cummings's references to standards of care are no less articulated or explained than those in *Martinez*. In *Martinez*, the court made it clear that even highly general references to source material and personal experience were enough to establish that expert testimony had a basis in reliable principles and methods. The court noted that Dr. Cummings clearly relied on review of the relevant medical records in forming his opinion. 33 F.4th at 32. The court also found it relevant that in a deposition, the expert used the words "[i]t says in the literature" in establishing that parts of the medical records suggested that standards of care

were violated and that the expert had established that he had personal expertise in the area he could rely upon as well. *Id*. These factors alone allowed the court to find that "the medical records, combined with [the expert's] own clinical experience, provided a sufficiently reliable basis for his opinions." *Id*. at 32–33. Similarly, Dr. Cummings has provided a list of literature that he relied upon in forming at least some of his opinions, Dkt. 91-7, and reportedly brought literature generally undergirding his opinions to his depositions; he has established that he has a significant level of expertise in areas relevant to the opinions he has offered; and he has clearly reviewed pertinent medical records in some detail in forming his opinions. He has therefore clearly met the standard for showing that there is a sufficiently reliable basis for his opinions as it is outlined in *Martinez*.

In his report, Dr. Cummings states that the purported failures on the part of individual defendants in this matter are each "[d]eviations from standards of care," a much more precise and explicit reference to standards of care than any that appears in *Martinez*. He has also sufficiently shown that he has relevant expertise and has reviewed relevant literature and medical records in reaching his conclusions. As a result of this and all of the above, I recommend finding that Dr. Cummings has sufficiently identified standards of care.

I next turn to the issue of whether Dr. Cummings fails to establish how each defendant caused or contributed to the harms claimed by Plaintiffs in this matter. As noted above, Plaintiffs must establish "a sufficient causal nexus between the breach and the claimed harm." *Cortés–Irizarry*, 111 F.3d at 189. Dr. Cummings's report is clearly deficient in this regard. Although Dr. Cummings concludes his report by saying that "it can be stated within a reasonable degree of medical certainty that the departures from the standard of care by the medical and nursing personnel at Hospital Pavia Santurce were the direct and proximate cause that led to the death of Mrs. Mercedes Ferrer Perez," he does not explain how or to what degree any individual departure

*Irizarry-Pagan et al. v. Metro Santurce, Inc. et al.*, Civil No. 18-1532 (JAG/BJM)                    15

from standards of care contributed to her death. Without more, Dr. Cummings has not established a sufficient causal nexus between the alleged breaches of standards of care and the harms claimed by Plaintiffs in this matter, as Dr. Cummings has not explained whether or not the patient's death would still have occurred if any particular departure or departures from standards of care had not happened.

However, although Dr. Cummings failed to establish causation in his report, *Martinez* makes it clear that even if the report itself does not establish causation, causation can be established via deposition testimony as well. 33 F.4th at 30-31. Plaintiffs acknowledge that Dr. Cummings must explain causation, but argue that Dr. Cummings explicitly stated in his deposition testimony how each individual deviation from standards of care contributed to causing the patient's demise. Plaintiffs go on to provide a supplemental motion in which they purportedly identify the points at which Dr. Cummings identified how each individual deviation contributed to the patient's death.

The vast majority of Dr. Cummings's deposition testimony and several of the points highlighted in Plaintiffs' supplemental motion fail to explain causation despite Plaintiffs' claims. Although Dr. Cummings claimed during deposition testimony that his report adequately explains how Dr. Rodriguez's failure to consider percutaneous coronary intervention contributed to the patient's death, Dr. Cummings's report and subsequent explanation are insufficient because he does not claim that the patient would have survived if Dr. Rodriguez had done so; instead, he merely states of patients that "if you don't save their life, they die" without addressing whether the patient would have died anyway. Dkt. 132 at ¶ 8. Regarding Dr. Cummings's statements as to Dr. Vazquez's alleged actions, while Dr. Cummings states that the patient "would've possibly had the opportunity" to survive if Dr. Vazquez had been present when the patient began her "death spiral," Dkt. 132-2 at 155, he offers little to no explanation as to why this would be the case or how much

less remote this possibility would have been, so the causal chain is incomplete. *See, e.g.*, *Cortés–Irizarry*, 111 F.3d at 189 (in order to successfully raise a medical malpractice claim, a plaintiff must establish a sufficient causal nexus between the breach and some resultant harm). Dr. Cummings also opined during the deposition that if the nurses at the hospital had told the patient's family members, one of whom was a physician, more about her condition, then her death may have been avoidable because they would have "advocated" for her, Dkt. 132-2 at 226-29; however, Dr. Cummings fails to adequately explain how increased advocacy from family members could have led to the patient's chances of survival increasing, so the causal chain is again incomplete. At other points, Dr. Cummings did not specifically address causation at all, or if he did, he failed to explain how causation tied to each individual alleged failure he raised. *See* Dkt. 132 at ¶¶ 3-4, 9.

On the other hand, in a few of the points highlighted in the supplemental motion, Dr. Cummings does adequately explain causation. Dr. Cummings states that Dr. Marrero's alleged failure to "admit" the patient to telemetry or the ICU was connected to her demise because the factors that led to her death would have been more appropriately responded to in a telemetry or intensive care setting well in advance of her death, which he notes could have staved off her demise; this statement adequately explains how Dr. Marrero's purported failure supposedly connects to the patient's death. Dkts. 132 at ¶ 5, 132-2 at 69-71. This point implicates Drs. Maldonado and Cabrera as well, as Dr. Cummings claims that they too should have admitted the patient to telemetry or the ICU. As to the patient's "do not resuscitate" (or "DNR") order, Dr. Cummings adequately explains how he believes that the patient did not have a valid DNR order in place, states that her symptoms were allegedly not appropriately responded to as a result, and accuses Hospital Pavia of failing to call a code blue emergency response to the patient becoming unresponsive in part because the patient had an invalid DNR; he then goes on to note that the

patient would have had a better chance of survival if the invalid DNR had not been in place. Dkts. 132 at ¶ 6, 132-2 at 112-15. Dr. Cummings goes on to sufficiently explain his belief that Dr. Rodriguez contributed to the patient's death by not considering that certain of her problems might have been caused by CHF, thereby allegedly feeding into the decision to not take an EKG of the patient, which in turn purportedly led to the patient not being treated for cardiac issues when Dr. Cummings claims that she still "could have been salvaged." Dkts. 132 at ¶ 10, 132-2 at 239-42. This last explanation implicates most of the other doctors named in the suit as well, as Dr. Cummings states in his report that Drs. Marrero, Maldonado, Cabrera, Perez, and Garcia all failed to sufficiently consider CHF. To a limited extent, Dr. Cummings has therefore adequately explained how he believes Hospital Pavia and Drs. Marrero, Maldonado, Cabrera, Rodriguez, Perez, and Garcia caused or contributed to the patient's death.

Ultimately, through his deposition testimony Dr. Cummings successfully explains causation as to some purported violations of standards of care that he cites in his report, but he fails to explain causation as to the majority of the violations he cites. Except as stated above, Dr. Cummings fails to explain whether or not each doctor (and Hospital Pavia) actually caused or contributed to the patient's death via their alleged violations of standards of care. As a result, and since I have already recommended finding that Dr. Cummings's opinions and testimony should not be excluded for insufficiently identifying standards of care, I recommend finding that testimony as to the purported violations of standards of care that Dr. Cummings has successfully explained caused or contributed to the patient's death (as outlined above) be permitted, but all other opinions and testimony offered by Dr. Cummings be excluded.

## CONCLUSION

For the foregoing reasons, I recommend that the motion to exclude the opinions and testimony of Dr. Cummings be **GRANTED IN PART**. Testimony as to Dr. Cummings's opinion

that Drs. Marrero, Maldonado, and Cabrera violated standards of care by allegedly failing to admit the patient to telemetry or the ICU should be permitted; testimony as to Dr. Cummings's opinion that Hospital Pavia violated standards of care by allegedly failing to initiate a "code blue" emergency response due in part to a supposedly invalid DNR when the patient became unresponsive should be permitted; testimony as to Dr. Cummings's opinion that Drs. Marrero, Maldonado, Cabrera, Rodriguez, Perez, and Garcia violated standards of care by allegedly not sufficiently considering that CHF was contributing to her other medical issues should be permitted; and all other opinions and testimony outlined by Dr. Cummings in his report should be excluded.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen days of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 8th day of August 2022.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge